## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Julie M. C.,                                     Case No. 21-cv-2741 (TNL)

      Plaintiff,

v.                                                              **ORDER**

Kilolo Kijakazi,
Commissioner of Social Security,

      Defendant.

---

Gerald S. Weinrich, Weinrich Law Office, Northgate Center, 1201 1/2 Seventh Street Northwest, Suite 214, Rochester, MN 55901 (for Plaintiff); and

James D. Sides, Social Security Administration, Office of the General Counsel, 1301 Young Street, Suite 350, Mailroom 104, Dallas, TX 75202; and Ana H. Voss, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

---

## I. INTRODUCTION

Plaintiff Julie M. C. brings the present case, contesting Defendant Commissioner of Social Security's denial of disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

This matter is before the Court on the parties' cross motions for summary judgment. ECF Nos. 15, 18. Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 15, is

**DENIED**, and the Commissioner's Motion for Summary Judgment, ECF No. 18, is **GRANTED**.

## II. PROCEDURAL HISTORY

On July 5, 2019, Plaintiff applied for DIB asserting that she has been disabled since January 5, 2019, due to a spine disorder.  Tr. 11, 158-61, 182.  Plaintiff's application was denied initially on September 27, 2019, and again upon reconsideration on January 29, 2020.  Tr. 11, 55-86.

Plaintiff appealed the reconsideration of her DIB determination by requesting a hearing before an administrative law judge ("ALJ").  Tr. 11, 102-03.  The ALJ held a telephone hearing in August 2020, and later issued an unfavorable decision.  Tr. 8-30. After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which was denied.  Tr. 1-5.

Plaintiff then filed the instant action, challenging the ALJ's decision.  Compl., ECF No. 1.  The parties have filed cross motions for summary judgment.  ECF Nos. 15, 18. This matter is now fully briefed and ready for a determination on the papers.

## III. RELEVANT MEDICAL RECORDS

Among other conditions, Plaintiff has a history of spine issues and lower back pain following a work-related injury in 2008.  *See, e.g.,* Tr. 268, 291, 367, 343, 402-03. According to her doctors, her pain has been treated conservatively.  *See, e.g.*, Tr. 268, 343.

### A. 2018

In June 2018, Plaintiff saw Jennifer Bold, A.P.R.N., C.N.P., D.N.P., for worsening back pain.  Tr. 349.  Plaintiff reported that the pain caused her to miss three days of work

and that she was taking ibuprofen and Tylenol for the pain.  Tr. 349.  Dr. Bold noted that Plaintiff had a decreased range of motion, and she limps on her left side.  Tr. 350.  Dr. Bold ordered x-rays of the spine and referred Plaintiff to a spine clinic for further evaluation and a possible injection.  Tr. 350.  Dr. Bold advised Plaintiff to get a physical therapy evaluation, which Plaintiff declined.  Tr. 349-50.  Plaintiff stated that she tried injections and physical therapy in the past and they were not effective, but she would be interested in trying injections again given the severity of the pain.  Tr. 349.

In July 2018, Plaintiff saw Randy Shelerud, M.D., for lower back and left leg pain. Tr. 343.  She reported that her lower back pain had worsened over the last four or five weeks and she has missed work intermittently because of the symptoms.  Tr. 343.  Dr. Shelerud noted that no objective findings support a diagnosis of lumbar radiculopathy.  Tr. 344.  He noted that he expects Plaintiff to recover her ability to move well without significant pain.  Tr. 345.  He recommended Plaintiff stay active, stretch, and participate in physical therapy.  Tr. 345.  Plaintiff stated she was not interested in physical therapy, oral medications, or injections, because none of these have been effective for her in the past. Tr. 345.  Thus, Dr. Shelerud noted that the appointment "ended with no specific recommendations that [Plaintiff] was in agreement with."  Tr. 345.  Dr. Shelerud noted that it was "concerning" that Plaintiff declined to try any of these treatments and did not request any other treatment for the pain, and opined "that there may be some other psychosocial stressors that are adding to her disability [] and work ability."  Tr. 345.

In August 2018, Plaintiff saw Scott Holtz, M.D., for back pain.  Tr. 339.  Plaintiff reported having more exacerbations of left-sided back pain for the last two years.  Tr. 339.

She reported having pain most severely eight days ago where she felt weakness and a foot drop on the left leg, but said she is now feeling like her normal self again.  Tr. 339.  Dr. Holtz directed Plaintiff to get an MRI of her lumbar spine.  Tr. 339.  A few days later, Dr. Holtz noted that the MRI "look[ed] great."  Tr. 339.  He also noted that Plaintiff's bone alignment has not changed over the past three years and there is no worrisome disc disease or nerve impingement.  Tr. 339.  Additionally, Dr. Holtz noted that the plan moving forward is "[n]o change."  Tr. 339.

In September 2018, Plaintiff saw Keith Bengtson, M.D., for lower back pain.  Tr. 336.  Dr. Bengtson noted that Plaintiff continues to have lower back pain, has been treating the pain with "conservative care," and is looking for a more "aggressive approach."  Tr. 336.  Dr. Bengtson observed that Plaintiff has limited lumbar active range of motion and obvious thoracolumbar scoliosis.  Tr. 336.  Dr. Bengtson recommended Plaintiff consider injection therapy and get facet injections.  Tr. 337.

Plaintiff also saw Dr. Bold in September 2018.  Tr. 334.  She noted that Plaintiff continues to have left joint pain and left-sided lower back pain that radiates down the back of her left leg to her knee.  Tr. 335.  Dr. Bold also noted that Plaintiff plans to get injections into her spine soon.  Tr. 335.  Plaintiff reported that she can vacuum and wash dishes but finds it very difficult to bend over.  Tr. 335.  She reported being able to kneel on the ground to pull weeds, but also reported feeling worsening pain and stiffness the day after doing so.  Tr. 335.  She also noted that she can stand approximately one-and-a-half hours without much difficulty.  Tr. 335.  Dr. Bold recommended that Plaintiff engage in physical therapy.

4

Tr. 336.  Dr. Bold also explained to Plaintiff that she needs to return to work, even if just for two hours a day.  Tr. 336.

Plaintiff also saw Robin Molella, M.D., in September 2018 to discuss health issues impacting her ability to work.  Tr. 332-33.  Dr. Molella opined that starting in October 2018, Plaintiff could work four days per week and no more than two shifts without a day off.  Tr. 334.  She also opined that Plaintiff should work a maximum of four hours per day. Tr. 334.

Plaintiff received lumbar spine facet injections at the end of September 2018.  Tr. 367.  A week later, Plaintiff saw Lawrence Steinkraus, M.D., for a work status evaluation. Tr. 331.  Plaintiff reported that she has not noticed any improvement from the spine injections.  Tr. 332.  She also stated that she was supposed to start work gradually but could not because she had an exacerbation of her back pain.  Tr. 331; *see also* Tr. 364.  She stated that she is not ready to go back to work and asked Dr. Steinkraus to extend her time off. Tr. 332.  Dr. Steinkraus extended Plaintiff's time off another week and directed her to follow up with the spine clinic.  Tr. 332.

In October 2018, Plaintiff received a sacroiliac joint injection in the posterior inferior aspect of the sacroiliac joint.  Tr. 364.  The next day, she saw Dr. Molella for a work status evaluation.  Tr. 329.  Plaintiff told Dr. Molella that she has not experienced many benefits from the injections.  Tr. 331.  Dr. Molella opined that Plaintiff can work up to four hours per day for two days per week.  Tr. 331.  Further, she opined that Plaintiff must be able to change positions of work as needed, take two ten-minute breaks every four hours, and walk and stretch as needed.  Tr. 331.

At the end of October 2018, Plaintiff again saw Dr. Molella to review her work restrictions. Tr. 324. Dr. Molella noted that Plaintiff should return to work with the same restrictions she provided at the last appointment. Tr. 326.

Plaintiff again saw Dr. Molella at the end of November 2018. Tr. 312. Dr. Molella noted that since she last saw Plaintiff, she underwent surgery for ear-nose-throat ("ENT") related issues, developed a possible chondritis postop, and developed significant vertigo and pain. Tr. 313. But Dr. Molella stated that she "do[es] not believe that the back pain will prevent her from returning to her job," and "think[s] that if we were not dealing with her ENT concerns she [would] already [be] back at work." Tr. 313. Dr. Molella noted that Plaintiff continues to work through her ENT and spine concerns and scheduled a follow-up appointment for mid-December. Tr. 314.

At Plaintiff's follow-up appointment in December 2018, Dr. Molella noted that Plaintiff continues to work through her ENT and spine concerns, is unable to work at all, and should return for a follow-up appointment in January. Tr. 311.

**B. 2019**

In January 2019, Plaintiff saw Dr. Molella for her follow-up appointment. Tr. 307. Dr. Molella wrote that since her last appointment, Plaintiff has had significant improvement in her vertigo and ear symptoms but continues to have difficulty with back pain. Tr. 307. Plaintiff also reporting falling at the end of December. Tr. 307. Dr. Molella noted that Plaintiff has prolonged and persistent footdrop and is therefore at risk of falling. Tr. 307. Dr. Molella opined that Plaintiff is still unable to work because of her back pain. Tr. 309.

In January, Plaintiff also saw Alicia Sticha, P.A.-C., M.S., after being referred for chronic lower back pain-related issues. Tr. 303. Plaintiff reported that the pain in her back is constant, worse with bending, standing, cold, and prolonged walking, and improved with heat. Tr. 303. She reported that she has not experienced significant improvement in her pain from the injections in September and October 2018. Tr. 304.

Plaintiff underwent a lumbar medial branch block. Tr. 304-05. Plaintiff reported significant discomfort with the procedure and Narayan Kissoon, M.D., noted that "[i]n the future, percutaneous interventions for her back pain are likely not a good option given the issues she had with just the superficial local anesthetic injections." Tr. 303.

In February 2019, Plaintiff saw Dr. Bengtson Tr. 302. He noted that Plaintiff did not find relief from the injections, could not tolerate medial branch blocks, and continues to have pain in the mid-lower lumbar spine. Tr. 302. Dr. Bengtson noted that the imaging studies show no clear impingement on the left L5 nerve but show worsening scoliosis. Tr. 302. Dr. Bengtson referred Plaintiff for scoliosis films and flexion and extension films of the lumbar spine and to see Paul Huddleston, M.D. Tr. 302.

The next day, Plaintiff saw Dr. Huddleston for a consultation. Tr. 296. Plaintiff reported that her back pain and leg pain are equally disabling and severe on a daily basis, and that she has trouble working due to her pain. Tr. 296. Dr. Huddleston reviewed Plaintiff's imaging studies and referred her to the pain clinic for consideration of a dorsal column stimulator. Tr. 298.

A few days later, Plaintiff saw Dr. Molella for a work status evaluation. Tr. 293. Dr. Molella noted that Plaintiff's vertigo and ear symptoms have improved, though she has

permanent hearing loss, and that Plaintiff continues to experience back problems.  Tr. 294.

Among other limitations, Dr. Molella opined that Plaintiff could work up to four hours a

day, three days per week, with no more than one day without a day off, and must be able

to have frequent changes of position for comfort.  Tr. 296.

Plaintiff also saw Patrick Harper, M.D., for back and leg pain in February 2019.  Tr.

291.  Plaintiff reported constant pain in her lower back and left leg that is sharp, burning,

aching, dull, and deep.  Tr. 291.  She stated that sitting and walking are most painful, but

it also bothers her to bend forward or backward, get up from a chair, walk stairs, stand, lay

down, or lift.   Tr. 291.  She also reported that her pain is alleviated with rest, sitting, lying

down, and taking medications like Aleve.  Tr. 291.  Plaintiff noted that she is returning to

work next week as a patient appointment coordinator.  Tr. 292.  Dr. Harper reviewed

Plaintiff's records and recommended that she pursue physical therapy, which Plaintiff

declined to do.  Tr. 293.  He also recommended Plaintiff try some neuro-modulating

medications like gabapentin.[1]  Tr. 293.

In March 2019, Plaintiff saw Dr. Molella for another work evaluation.  Tr. 288.  Dr.

Molella noted that Plaintiff is not a candidate for further intervention, she is not on neuro-

modulating medications, and has been referred to her primary care provider for additional

medical therapy.  Tr. 285, 289.  Dr. Molella kept Plaintiff off work to allow her to start and

adjust to her medications.  Tr. 290.

---

[1] Gabapentin is a medication used in combination with other medications to relieve pain.  *Gabapentin*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a694007.html (last accessed Feb. 6, 2023).

Plaintiff also saw Dr. Bold, who noted that Plaintiff was seen in the pain clinic for consideration of a nerve stimulator, but they were reluctant to move forward because Plaintiff has not started any medications to help with her chronic pain. Tr. 287. Dr. Bold also noted that Plaintiff has concerns about taking gabapentin because it can cause worsening mood. Tr. 287. Dr. Bold started Plaintiff on nortriptyline[2] but recommended that Plaintiff start gabapentin if there is no improvement in her mood with nortriptyline.

In April 2019, Plaintiff again saw Dr. Molella, who concluded that Plaintiff could return to work in approximately two weeks. Tr. 277. Among other limitations, Dr. Molella opined that Plaintiff should work a maximum of four hours per day, up to two days per week, work no more than one day without a day off, and should use a motorized scooter for distances. Tr. 279.

In May 2019, Dr. Molella opined similarly that Plaintiff could work a maximum of four hours per day, up to two days per week. Tr. 276. About a week later, however, as Plaintiff was going to return to work, she fell and re-injured her back. Tr. 271. While Dr. Molella changed Plaintiff's work restrictions and noted that Plaintiff is unable to work in any capacity, she noted her concern that Plaintiff has failed to return to work in any capacity. Tr. 273. She wrote that she "do[es] not think [Plaintiff] is disabled from all work which places [] her in a vulnerable position if we cannot return her in a timely fashion to full employment." Tr. 273.

---

[2] Nortriptyline is a medication used to treat depression. *Nortriptyline*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682620 html (last accessed Feb. 6, 2023).

In June 2019, Dr. Molella noted that Plaintiff has not returned to work and continues to endorse significant symptoms of pain. Tr. 268. Dr. Molella wrote that she "do[es] not believe that there is much left [] for her in terms of direct interventions for her back pain," and that Plaintiff's pain can be managed through moderation and other coping strategies. Tr. 270. She also wrote that Plaintiff would benefit from a pain rehabilitation program. Tr. 270. Dr. Molella also noted that she believes Plaintiff "needs to return back to employment." Tr. 270. Dr. Molella also opined that she "do[es] not find [a] medical reason that she cannot return back to moderated sedentary duties." Tr. 270. She limited Plaintiff to working up to four hours per day, two days per week, with no more than one day without a day off, a motorized scooter for distances, and frequent changes in position as needed for comfort, among others. Tr. 270.

In August 2019, Plaintiff saw Dr. Molella for another work evaluation. Tr. 418. Dr. Molella noted that Plaintiff continues to endorse significant symptoms of pain, complains of persistent footdrop that creates a risk of falling, and reports falling since her last visit. Tr. 418. Dr. Molella again noted that there is nothing further they can do for Plaintiff's back pain, and she should manage her pain through moderation and other coping strategies. Tr. 420. Dr. Molella also recommended Plaintiff complete a pain rehabilitation program and get a gait assessment for safety issues in light of her previous falls. Tr. 420-21. Dr. Molella noted that Plaintiff is unable to work in any capacity. Tr. 421.

The following week, Plaintiff saw William Dickson, Ph.D., L.P., for a consultative psychological examination. Tr. 402. During the examination, Dr. Dickson noted that Plaintiff appeared to be in physical distress. Tr. 406. For example, Dr. Dickson wrote:

> [Plaintiff] indicated that she is 'in pain right now.' She then
> slowly got up from the couch, walked gingerly to the wall and
> propped herself up against the wall for a few minutes while
> further disclosing information. She slowly sat back down and
> then repeated this again several times during the interview.

Tr. 405.  At another point, Dr. Dickson reported that Plaintiff "would sit on the edge of the

couch, shift from back to fore of the couch, leaning on the armrest with groaning and

grimacing notable."  Tr. 406.

At the end of August 2019, Plaintiff saw Erika Beetcher, A.P.R.N., C.N.P., M.S.,

for a work status evaluation.  Tr. 416-17.  Beetcher noted that Plaintiff has been off work

for many months due to back pain, left leg pain, and left foot numbness.  Tr. 417.  Plaintiff

reported recurrent falls and that she does not feel safe working in any capacity because of

her fall risk.  Tr. 417.  Beetcher spoke with Plaintiff about returning to work that is

primarily sitting and that avoids working at heights to minimize her fall risk.  Tr. 417.  She

also recommended that Plaintiff complete a safety evaluation with a gait assessment.  Tr.

417.

In September 2019, Plaintiff saw Katie Traver, P.T., D.P.T., for a safety evaluation

with a gait assessment.  Tr. 435.  Plaintiff reported that she has fallen six times in the past

year due to her left toe catching things like stairs or uneven ground.  Tr. 436.  After

completing the evaluation, Dr. Traver concluded that Plaintiff has a mild fall risk which

could be improved with proper balance training.  Tr. 438.

A few days later, Plaintiff saw Dr. Molella for another work evaluation.  Tr. 435.

Dr. Molella reported that Plaintiff's symptoms are stable and she is "quite optimistic about

significant improvement given indication of physical therapy with plan for twice weekly

sessions as well as utilizing a cane once it is available." Tr. 435.  Dr. Molella decided to keep Plaintiff off work for the next month to allow Plaintiff to establish a routine with physical therapy and obtain and become familiar with a cane.  Tr. 435.

At the end of September, Plaintiff had a physical therapy session with Dr. Traver. Tr. 430.  Dr. Traver noted that Plaintiff is able to ambulate with more confidence, her limp is reduced, and her functional gait dynamics are improved.  Tr. 431.  Dr. Traver also noted that Plaintiff seems to feel motivated using the cane and completing the exercises.  Tr. 431. When Dr. Traver began to discuss future physical therapy sessions, Plaintiff became emotional and reported that she would not have future financial support for additional sessions.  Tr. 431.  Plaintiff did not schedule another appointment, but Dr. Traver reminded her of the importance of continuing her exercises.  Tr. 431.

In November 2019, Plaintiff saw Dr. Molella for another work evaluation.  Tr. 449. Dr. Molella noted that Plaintiff is not fully disabled from working and she would like Plaintiff to return to transitional employment in hopes of finding work she can do despite her pain.  Tr. 449.  She opined that Plaintiff can work a maximum of four hours per day, up to two days per week, using a motorized scooter for all work except seated work, using a cane as needed for balance, and making frequent changes in position as needed for comfort, among other limitations.  Tr. 452.   Dr. Molella made the same conclusions in December 2019.  Tr. 453-55.

### C. 2020

Plaintiff saw Dr. Molella in January 2020 and reported that she returned to work. Tr. 456.  Plaintiff reported that she works in a warehouse with outside medical records and

12

sits or stands most of the time. Tr. 456. Plaintiff stated that she was scheduled for six shifts but called in three times because of depression and her back pain. Tr. 456. Dr. Molella explained to Plaintiff that she should continue with her current work restrictions, work on managing her depression, and contact her primary physician to consider a change in pharmacological therapy. Tr. 457.

In February 2020, Plaintiff reported that she has been able to work four-hour shifts twice a week. Tr. 458. She reported missing a four-hour shift. Tr. 458. Dr. Molella kept Plaintiff on the same work restrictions. Tr. 459.

In March 2020, Dr. Molella noted that Plaintiff has been working four-hour shifts and continues to manage her back pain. Tr. 466. Dr. Molella adjusted Plaintiff's work restrictions, writing that Plaintiff could start working four-hour shifts three days per week starting the end of March. Tr. 467. At the end of March 2020, Plaintiff told Beetcher that she has worked four shifts two days per week. Tr. 477. She stated that she is sore and is using her cane but is not using a scooter. Tr. 477. She also stated that she feels that she can continue to work four-hour shifts twice a week but does not feel that she can increase to three shifts per week. Tr. 477-78.

In early April 2020, Plaintiff reported that she fell while walking down the stairs at her home. Tr. 478. She reported that her back is very sore and that she feels she cannot work that week in any capacity. Tr. 478. Plaintiff reported another fall about a week later. Tr. 479. Dr. Molella changed Plaintiff's work restrictions back to four-hour shifts a maximum of two days per week, among other imitations. Tr. 480.

In May 2020, Plaintiff reported that her back pain and foot drop were feeling the same and that she falls once weekly on average.  Tr. 486.  She stated that she had been working four-hour shifts two days per week but was off due to a potential COVID-19 exposure.  Tr. 486.  She reported she does not feel that she can work more than four hours per day, two days per week safely and effectively.  Tr. 486.  Plaintiff's work restrictions were continued.  Tr. 486.

In June 2020, Plaintiff reported that she has been working two four-hour shifts per week.  Tr. 495.  Dr. Molella kept Plaintiff on the same work restrictions of two four-hour shifts per week.  Tr. 496.

### IV. STATE AGENCY CONSULTANTS' OPINIONS

In September 2019 and January 2020, two state agency medical consultants assessed Plaintiff's physical residual functional capacity.  Tr. 55-64, 71-80.  They opined that Plaintiff had exertional limitations.  Tr. 62, 78.  Specifically, Plaintiff was limited to occasionally lifting/carrying 20 pounds and frequently lifting/carrying 10 pounds.  Tr. 62, 78.  Additionally, Plaintiff could stand and/or walk for 2 hours and sit for 6 hours in an 8-hour workday.  Tr. 62, 78-79.  They also opined that Plaintiff had postural limitations, including occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling.  Tr. 63, 79.  They opined that Plaintiff should never climb ladders/ropes/scaffolds. Tr. 63, 79.  The state agency medical consultants also opined that Plaintiff had no manipulative, visual, communicative, or environmental limitations.  Tr. 63, 79.

Two state agency psychological consultants also assessed Plaintiff's mental residual functional capacity. Tr. 64-66, 80-82. They opined that Plaintiff had no understanding and memory limitations. Tr. 64, 80. They opined that Plaintiff had sustained concentration and persistence limitations. Tr. 64, 80. Specifically, Plaintiff is moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, and sustain an ordinary routine without special supervision. Tr. 64, 81. Plaintiff was not otherwise significantly limited. Tr. 64-65, 80-81. They opined that Plaintiff had no social interaction limitations. Tr. 65, 81. They opined that Plaintiff had adaption limitations, including that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting. Tr. 65, 81. But Plaintiff was not otherwise significantly limited. Tr. 65, 81.

## V. HEARING TESTIMONY

At the hearing in August 2020, Plaintiff testified that her previous full-time work experience in the past 15 years includes cosmetologist, housekeeper, receptionist, and appointment coordinator. Tr. 45-47. She currently works at Mayo Clinic Employment Services through their "work hardening program." Tr. 37, 42. Her job duties include going through medical records and getting them ready for scanning. Tr. 42. She takes out staples, makes sure the paper is flat, and confirms the paper can go through the scanner. Tr. 42. She also checks the documents to ensure the patient's name and date of birth are correct. Tr. 42-43.

Plaintiff testified that she has been on work restrictions since February 2019. Tr. 39. Plaintiff testified that since February 2020, she has worked four hours per day, two

days per week.  Tr. 37-38, 42.  Plaintiff stated that she has a limited ability to work due to lower back problems.  Tr. 39.  She testified that she is unable to sit or stand for long periods of time, cannot bend over or reach above her head, and can carry items only as heavy as a gallon of milk.  Tr. 39.  She stated she can only stand or sit for a maximum of an hour and a half before needing to change positions.  Tr. 39, 41. She then needs to stretch for about ten minutes before she can resume her position.  Tr. 41.  If she tries to stand or sit longer than an hour and a half, her back starts to cramp up, she starts having severe pain, and her left leg starts going numb.  Tr. 39.  She stated that she walks with a cane, which was prescribed by her physician in summer 2018.  Tr. 39-40.

Plaintiff testified that she does not believe that she is physically able to return to full-time work.  Tr. 44.  After a four-hour shift, she gets pain in her lower back and feels "very sore."  Tr. 43.  She rests for about 30 to 45 minutes and, depending on how bad her pain is, she either lays in bed and stretches out or takes Aleve to relax her muscles.  Tr. 43. She testified that she feels "[t]ired and still sore" the day after working.  Tr. 43.  While she has pain constantly, she does not take any pain medications.  Tr. 43.  She stated that she took pain medications in the past, but no longer does because they make her sleep often and fog her memory.  Tr. 43-44.

She also testified that she has a driver's license and can work the foot controls of her car without any difficulty.  Tr. 40.  She can drive for approximately an hour and a half before needing to stop and get out of the car to stretch.  Tr. 40.  She also goes grocery shopping and can push the cart, though she needs assistance to reach items above the shoulders or below the waist.  Tr. 41.  She testified that she can only carry items that weigh

ten pounds or less, such as a gallon of milk. Tr. 41-42. Further, she testified that she cannot bend over and must use a grabber to pick things up off the floor. Tr. 42.

Plaintiff also testified that she does the majority of household chores, like cleaning, dusting, doing dishes, and doing laundry. Tr. 40. Plaintiff stated that she needs assistance from her daughters or fiancé to reach down into the dishwasher and washing machine, put clothes into the dryer, take them out, put them in a basket, and carry them to the couch. Tr. 40. She testified that she can fold clothes while sitting on the couch or standing in the bedroom and leaning next to the bed. Tr. 40. She also testified that she can vacuum, but only for about ten minutes. Tr. 40-41.

Vocational expert William Villa also testified at the hearing. Tr. 45. Villa testified that a hypothetical individual with Plaintiff's education, experience, and limitations could not perform Plaintiff's past work as a cosmetologist, appointment clerk, receptionist, or housekeeper, because her past relevant work is classified as "semiskilled" work. Tr. 49. Villa testified that a hypothetical individual could, however, perform other "sedentary, unskilled" occupations, such as electronics worker, semiconductor bonder, and optical accessory polisher. Tr. 49. Villa testified that these sedentary, unskilled jobs would allow an individual to sit and stand in the workspace while performing the tasks at hand. Tr. 50. Villa testified that stretching every few minutes, just briefly, would be allowed in these jobs. Tr. 50-51. In other words, people in these occupations "are not cemented into a chair to sit down," and people can transfer from standing to sitting as needed while working. Tr. 51. He also testified that these occupations allow the individual to use a cane when ambulating. Tr. 51-52. He testified that the Dictionary of Occupational Titles does not

17

mention a cane but, in his experience, a cane or assistive device can simply be left off to the side and used as needed.  Tr. 52.

Villa testified that it is typical for an employee to take two breaks and a meal break. Tr. 52-53.  If the individual were to experience a symptom which prompts an unscheduled break, the frequency and duration of those breaks would depend on the tolerance of the employer.  Tr. 52.  Villa estimated that if those breaks happened about 15 percent of the time during an eight-hour shift, an employer would not tolerate that because that would be too much time not doing the individual's job.  Tr. 52.  In the unskilled occupational base, if an individual was absent once to twice a month for two or three consecutive months, that individual would likely be let go.  Tr. 53.  When the ALJ asked Villa about an individual who was limited to working only one or two days per week or not working a full eight-hour shift, he testified that would constitute disability per the social security ruling on non-full-time work.  Tr. 53-54.

## VI. ALJ'S DECISION

The ALJ found that Plaintiff has engaged in substantial gainful activity beginning in February 2020, but that there has been a continuous 12-month period during which Plaintiff did not engage in substantial gainful activity.  Tr. 13.  The ALJ then found that Plaintiff had the following severe impairments: degenerative disc disease of the thoracolumbar spine, with scoliosis; status post fusion with instrumentation at L4-S1 in 2010, with chronic pain syndrome; obesity; obstructive sleep apnea; a depression disorder; and somatic symptom disorder.  Tr. 14-15.  The ALJ concluded that Plaintiff did not have

an impairment or combination of impairments that met or equaled a listed impairment in

20 C.F.R. pt. 404, subpt. P, app.1.  Tr. 15-17.

The ALJ further found that Plaintiff had the residual functional capacity to perform

sedentary work[3] with additional limitations as follows:

> [N]o climbing of ladders, ropes, or scaffolds; occasional
> climbing of ramps and stairs; no balancing in the context of
> being at heights; occasional stooping and crouching; no
> kneeling; no crawling; and routine, repetitive, detailed but not
> complex types of tasks and instructions that would align with
> a specific vocational preparation of a one or a two as defined
> in the Dictionary of Occupational Titles; occasional brief
> interaction with coworkers, but the tasks are those that can be
> performed independently and would not require teamwork or
> collaboration for completion, and no direct serving of the
> public; and no fast pace or high production goal or quota type
> tasks such as telephone quotas or work on an assembly line or
> moving conveyor belt; as well as allowance for use of a cane
> when ambulating.

Tr. 17.

Based on Plaintiff's age, education, work experience, residual functional capacity,

and the testimony of the vocational expert, the ALJ found that Plaintiff was capable of

performing the "representative sedentary unskilled occupations" such as electronics

---

[3] As set forth in the regulations,

> [s]edentary work involves lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like docket files, ledgers, and small tools.
> Although a sedentary job is defined as one which involves sitting, a certain
> amount of walking and standing is often necessary in carrying out job duties. Jobs
> are sedentary if walking and standing are required occasionally and other
> sedentary criteria are met.

20 C.F.R. § 404.1567(a); *accord* 20 C.F.R. § 416.967(a).

worker, semiconductor bonder, and optical accessory polisher.  Tr. 26-27.  Accordingly, the ALJ concluded that Plaintiff was not under disability.  Tr. 27.

## VII. ANALYSIS

Disability benefits are available to individuals who are determined to be under a disability.  42 U.S.C. § 423(a)(1); *accord* 20 C.F.R. § 404.315.  An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1505(a).  This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience.  42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process.  20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).  In general, the burden of proving the existence of disability lies with the claimant.  20 C.F.R. § 404.1512(a).  Once the claimant demonstrates that she cannot perform past work due to a disability, "the burden

of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citations omitted).

A claimant's "residual functional capacity is the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."); *see also Schmitt v. Kijakazi*, 27 F.4th 1353, 1360 (8th Cir. 2022). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (quotation omitted); *accord Schmitt*, 27 F.4th at 1360.

At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092; *see also* 20 C.F.R. § 404.1546(c). "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *Norper*, 964 F.3d at 744-45. As such, there is no requirement that a residual-

functional-capacity determination "be supported by a specific medical opinion." *Schmitt*, 2022 WL 696974, at *5 (quotation omitted).   Nor is an ALJ "limited to considering medical evidence exclusively." *Id.* (quotation omitted).  Accordingly, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *see* 20 C.F.R. § 404.1546(c).

When determining the residual functional capacity, an ALJ must consider all medical opinions submitted and evaluate them for persuasiveness.   20 C.F.R. § 404.1545(a)(1).  Under the regulations, the ALJ does not defer to any medical opinions, including opinions from the claimant's treating medical sources. 20 C.F.R. § 404.1520c(a). The ALJ instead considers all medical opinions according to five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. 20 C.F.R. § 404.1520c(c).  Supportability[4] and consistency[5] are the most important factors, and the ALJ must explain how those two factors were considered in

---

[4] The regulations define the factor of "supportability" as follows:

> The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(1).

[5] The regulations define the factor of "consistency" as follows:

> The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence form other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 404.1520c(c)(2).

determining the persuasiveness of a medical opinion.  20 C.F.R.§ 404.1520c(b)(2).  The ALJ is not required to explain the remaining factors unless the ALJ "find[s] that two or more medical opinions . . . about the same issue are both equally well supported . . . and consistent with the record . . . but are not exactly the same." 20 C.F.R. § 404.1520c(b)(2)-(3).

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "[T]he threshold for such evidence is not high." *Id.*  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (per curium) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).  The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks*, 687 F.3d at 1091.  "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted).  Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Plaintiff argues that the ALJ's decision should be reversed and remanded for determination benefits because the ALJ erred for several reasons. First, Plaintiff argues that the ALJ's finding that Plaintiff retains the ability to perform sedentary work on a sustained basis is not supported by substantial evidence on the record as a whole. Pl.'s Mem. in Supp. at 10, ECF No. 16. Specifically, Plaintiff contends that the ALJ's residual functional capacity fails to include Plaintiff's "need for frequent changes of position, or limitations with respect to hours and days worked, restrictions that were still in effect according to her treating physicians, at the time of the hearing." *Id.* at 15-16. Additionally, Plaintiff argues that the ALJ erred by not giving greater weight to the opinions of Plaintiff's physicians at Mayo Clinic regarding permanent restrictions and limitations to part-time work. *Id.* at 16. Finally, Plaintiff argues that the ALJ's determination that Plaintiff began working at the level of substantial gainful activity in February 2020 should be remanded for further consideration. Pl.'s Reply at 1, ECF No. 20.

### A. Residual Functional Capacity

Plaintiff first argues that the ALJ's residual functional capacity determination is not supported by substantial evidence in the record because it is "flatly at odds with the medical record." Pl.'s Mem. in Supp. at 15-16. Specifically, Plaintiff contends that the ALJ failed to incorporate appropriate limitations in the residual functional capacity for part-time work and frequent changes of position. Pl.'s Mem. in Supp. at 12. This Court disagrees and finds that the ALJ's residual functional capacity determination is supported by substantial evidence in the record. The Court finds that the ALJ considered all of the relevant evidence

24

in determining that Plaintiff had the residual functional capacity to perform sedentary work with specific limitations and did not err by failing to include limitations for part-time work and frequent changes in position. *See* Tr. 17.

First, the ALJ summarized the relevant medical records, noting that Plaintiff's "minimal examination findings and treatment" do not support additional limitations like frequent changes in position or part-time work. *See* Tr. 21. The ALJ repeatedly pointed to places in the medical record showing that Plaintiff did not require such "extreme limitations." *See* Tr. 20. For example, the ALJ noted:

> [I]n February 2019, [Plaintiff] reported ongoing back pain, with worsening left foot weakness. However, upon examination, she had a fairly normal gait, and was able to heel/toe walk. Manual muscle testing showed only mild weakness in the left tibialis anterior. [Plaintiff] was otherwise noted to have only tenderness of the lumbar spine. (1F/40) It was noted that imaging studies showed some broken S1 screws, which would not be expected to cause any symptoms. It was specifically noted that there was no evidence of left L5 nerve root impingement to account for [Plaintiff's] symptoms. (1F/40, 96) * * * [Plaintiff] was recommended for a gradual return to work beginning March 15, 2019, no more than four hours per day, three days per week, with no consecutive work days; rare standing/walking, twisting/turning, and bending/stooping; no squatting/kneeling/crawling/climbing; and primarily seated work, with occasional lifting/carrying and pushing/pulling limited to 10 pounds. (1F/34) However, these limitations are not supported by or consistent with [Plaintiff's] minimal examination findings and treatment.

Tr. 19. Later, the ALJ continued:

> On an examination in May 2019, [Plaintiff] was again noted to be in no distress, to be able to sit and stand without difficulty, and to have normal gait, including heel and toe gait. Only limited lumbar range of motion was noted. (1F/14) She subsequently reported a fall and increased back pain later in

> May 2019, but an examination showed her to be in no distress,
> with normal gait. It was noted only that she sat and stood
> 'stiffly.' (1F/11) * * * Previous limitations for a gradual return
> to work were also recommended, but these extreme limitations
> are not consistent with or supported by the above minimal
> examination findings and treatment recommendations.

Tr. 20. When specifically discussing Plaintiff's Mayo Clinic physicians' opinions
regarding part-time work, the ALJ found:

> no substantial support in the record as a whole for reducing
> [Plaintiff] to less than full-time work, particularly given
> [Plaintiff's] objective findings, exams, observations by
> providers, and lack of any substantial medical treatment in
> terms of surgical intervention, physical therapy, participation
> in a pain management program, or even prescribed pain
> medication.

Tr. 23. The ALJ also cited numerous places in the record where Plaintiff was able to sit,
stand, and walk without difficulty. *See, e.g.*, Tr. 18 (citing 1F/45, 47) (demonstrating
ability to sit/stand without difficulty and normal gait); Tr. 19 (citing 1F/40) (demonstrating
fairly normal gait and ability to walk heel and toe); Tr. 19 (citing 1F/35) (demonstrating
ability to stand on heels and toes without difficulty); Tr. 19 (citing 1F/32-33)
(demonstrating ability to sit and stand without difficulty and normal gait); Tr. 19 (citing
1F/30) (demonstrating ability to navigate stairs); Tr. 19 (citing 1F/30-31) (demonstrating
normal lower extremity strength, normal gait, and ability to heel and toe walk easily); Tr.
20 (citing 1F/22, 28) (demonstrating ability to sit and stand without difficulty, normal gait,
and normal heel and toe gait); Tr. 20 (citing 1F/17) (same); Tr. 20 (citing 1F/14) (same);
Tr. 21 (citing 4F/11, 13-14) (same); Tr. 20 (citing 3F/9) (demonstrating ability to sit and
stand stiffly but in no distress with normal gait).

The ALJ also discussed Plaintiff's conservative treatment.  For example, the ALJ noted that Plaintiff was seen for consideration of a spinal cord stimulator, but it was not recommended due to only diffuse myofascial pain on examination.  Tr. 19.  Plaintiff was instead recommended for physical therapy, which she declined.  Tr. 19; *accord* Tr. 21. Plaintiff also started nortriptyline but stopped the medication on her own after two weeks due to feeling like a "zombie."  Tr. 20.  She also noted that she could tolerate her pain with Aleve and that she did not want other medications.  Tr. 21.

Additionally, the ALJ properly looked beyond the medical evidence, considering, among other things, Plaintiff's testimony at the hearing, including the symptoms she experiences, as well as her daily activities.  Tr. 16, 19.  The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record."  Tr. 18.  The ALJ noted, for example, that while Plaintiff reported reduced functioning primarily due to pain, she managed her personal cares, did some cooking and household chores, went out daily, went shopping for groceries and personal items, handled her finances, got her daughters off to school and picked them up from school, went camping and boating, and attended her daughters' sporting events.  Tr. 16. The ALJ also noted that Plaintiff testified that she can drive for an hour and a half at a time.  Tr. 16.  Accordingly, the ALJ found "no substantial support in the record as a whole for reducing [Plaintiff] to less than full-time work, particularly given [Plaintiff's] objective findings, exams, observations by providers, and lack of any substantial medical treatment in terms of

surgical intervention, physical therapy, participation in a pain management program, or even prescribed pain medication." Tr. 23.

The ALJ also properly considered the opinion evidence. Plaintiff argues that the ALJ erred by not giving greater weight to the opinions of her physicians at Mayo Clinic regarding permanent restrictions and limitations to part-time work. Pl.'s Mem. in Supp. at 16. Plaintiff contends that the Mayo Clinic physicians' opinions should have been given greater weight because they "were specifically charged with helping [Plaintiff] fin[d] and maintain continued employment with the Mayo Clinic, and provide opinions with regard to accommodations necessary to allow her to continue employment." Pl.'s Mem. in Supp. at 16-17. The ALJ, however, properly took into account the Mayo Clinic physicians' opinions' supportability and consistency with other evidence in the record. *See* 20 C.F.R. §§ 404.1520c(c)(1). The ALJ explained why she discounted the physicians' opinions that Plaintiff was limited to frequent changes in position for comfort and part-time work. Citing specific medical examinations and objective findings, the ALJ found that these opinions lacked support and were inconsistent with Plaintiff's "minimal examination findings and treatment." Tr. 21; *see also* Tr. 19-20. The Court has carefully reviewed the medical evidence and concludes that the ALJ's findings are supported by substantial evidence in the record. The ALJ addressed both the consistency and supportability of the Mayo Clinic physicians' opinions adequately in her assessment, and she therefore did not err by failing to give greater weight to their opinions.

Further, the Court agrees with the Commissioner that the Mayo Clinic physicians' opinions that Plaintiff is able to work only part-time are "inherently neither valuable nor

persuasive to the issue of whether [Plaintiff is] disabled," and the ALJ was not required to explain her reasons for finding the statements not persuasive. *See* 20 C.F.R. § 404.1520b(c); 20 C.F.R. § 404.1520b(c)(3)(i) ("[s]tatements that you are or are not disabled, . . . able to work, or able to perform regular or continued work" are "inherently neither valuable nor persuasive to the issue of whether you are disabled"); *see also Jason P. P. v. Kijakazi*, No. 20-cv-688 (TNL), 2021 WL 4483040, at *12 (D. Minn. Sept. 30, 2021) (citing *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight.")); *Murphy v. Kijakazi*, No. 1:20 CV 154 RWS, 2021 WL 3033404, at *6 (E.D. Mo. July 19, 2021) (finding that a statement that the claimant's "chronic pain decreased [his] ability to work [a] full day" was an issue reserved to the Commissioner); *Ferrario v. Kijakazi*, No. 4:20-CV-00638-SEP, 2021 WL 4399469, at *9 (E.D. Mo. Sept. 27, 2021) (finding that a physician's opinion that the claimant "is not able to function/capable of handling any kind of job at this juncture" is "not a medical finding for the ALJ's consideration; rather, it is a conclusion that should have been reserved to the ALJ"); *see also* Comm'r's Mem. in Supp. at 12, ECF No. 19.

In addition to evaluating the examinations and records from Plaintiff's treating physicians, the ALJ properly considered the opinions of the state agency medical consultants. *See* 20 C.F.R. § 404.1513a(b)(1) (ALJ required to consider opinions of state agency medical consultants as such "consultants are highly qualified and experts in Social Security disability evaluation"). The ALJ discussed the state agency medical consultants'

opinions that Plaintiff was limited to occasionally lifting/carrying 20 pounds and frequently lifting/carrying 10 pounds; standing and/or walking for 2 hours and sitting for 6 hours in an 8-hour workday ; and occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling.  Tr. 23; *see also* Tr. 62-63, 78-79.  The ALJ found the state agency medical consultants' opinions "somewhat persuasive," but "further reduced [Plaintiff] to the sedentary exertional level, with additional postural limitations and use of a cane, to address [Plaintiff's] subjective complaints of pain, as well as her obesity and untreated obstructive sleep apnea."  Tr. 23.  The ALJ further found that additional physical limitations, including a limitation regarding use of a scooter for ambulation, was not substantially supported by the record.  Tr. 23.  The Court finds that the ALJ properly analyzed the state agency medical consultants' opinions as a whole and gave sufficient reasons for finding the state agency medical consultants' opinions somewhat persuasive.

For the reasons stated above, the Court finds that the ALJ properly "undert[ook] a complete evaluation of the record, considering both physical and mental limitations, and the extent to which they can limit [Plaintiff's] ability to perform the usual activities associated with competitive work."  *See* Pl.'s Mem. in Supp. at 11-12.  The ALJ's thorough discussion of the relevant medical evidence demonstrates that the ALJ considered and rejected the Mayo Clinic physicians' limitations in frequent changes in position and part-time work.  The ALJ took into account the appropriate factors when determining the weight to assign to the Mayo Clinic physicians' opinions, and  Plaintiff has not met her burden to show that she has greater limitations than those determined by the ALJ.  *See Perks*, 687 F.3d at 1092 (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010)  ("[T]he

burden of persuasion to prove disability and demonstrate [residual functional capacity] remains on the claimant")).  Accordingly, the Court concludes that there is substantial evidence in the record to support the ALJ's residual functional capacity. *See Chaney*, 812 F.3d at 676 ("The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole.") (quotation omitted).

### B. Substantial Gainful Activity

Plaintiff also argues that the ALJ's determination that she began working at the level of substantial gainful activity in February 2020 should be remanded for further consideration.  Pl.'s Reply at 1.  According to Plaintiff, "[t]he earnings that the ALJ believe[d] to be Substantial Gainful Activity represented Long-Term Disability Payments made to [Plaintiff] through Mayo Clinic's LTD/STD benefit plan to make up the difference in what she was in [sic] earning wages during her light duty employment, and what she would have been able to make had she returned to full time work."  Pl.'s Reply at 1-2.

At step one of the ALJ's analysis, the ALJ must determine whether a claimant is engaging in "substantial gainful activity."  20 C.F.R. § 404.1520(b).  An activity is "substantial" if it "involves significant physical or mental activity, even if that activity is performed on a part-time basis."  *Dosdall v. Astrue*, No. 09-cv-1122 (RHK/JJG), 2010 WL 2287145, at *3 (D. Minn. Apr. 19, 2010) (citing 20 C.F.R. § 404.1572(a); *Reeder v. Apfel*, 214 F.3d 984, 989 (8th Cir. 2000)), *report and recommendation adopted*, 2010 WL 2291494 (D. Minn. June 3, 2010); *see* 20 C.F.R. § 404.1572(a) ("Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.").  An activity is "gainful" if it "is done

31

for pay or profit, regardless of whether the claimant actually realizes a profit." *Id*. at *4 (citing 20 C.F.R. § 404.1572(b); *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996)). If a claimant is working and the ALJ finds that the work is substantial gainful activity, the ALJ will find that the claimant is not disabled regardless of their medical condition, age, education, and work experience. 20 C.F.R. § 404.1520(b). If the claimant is not engaging in substantial gainful activity, the ALJ's analysis proceeds to the second step. 20 C.F.R. § 1520(a)(4).

In evaluating a claimant's work activity for substantial gainful activity, the "primary consideration will be the earnings [the claimant] derives from the work activity." 20 C.F.R. 404.1574(a)(1). The ALJ uses the claimant's earnings "to determine whether [the claimant] ha[s] done substantial gainful activity unless [the ALJ] ha[s] information from [the claimant], [the claimant's] employer, or others that shows that [the ALJ] should not count all of [the claimant's] earnings." *Id*. The ALJ does "not consider any income that is not directly related to [the claimant's] productivity." 20 C.F.R. § 404.1574(a)(2). When the claimant's "earnings exceed the reasonable value of the work [the claimant] perform[s], [the ALJ] consider[s] only that part of [the claimant's] pay which [they] actually earn." *Id*.

Here, at step one, the ALJ found that Plaintiff "testified to returning to competitive work in February 2020, and the record documents earnings consistent with substantial gainful activity beginning in the first quarter of 2020, when [Plaintiff] earned $4271." Tr. 13. The ALJ noted that the substantial gainful activity level for 2020 is $1260 per month, and Plaintiff "has submitted no evidence to support any work subsidies and/or no special circumstances or arrangements with the employer allowing her to earn at this level." Tr.

13.  Accordingly, the ALJ found that Plaintiff had engaged in substantial gainful activity beginning February 2020.  Tr. 13.  Thus, the ALJ's remaining analysis focused only on the other time periods where Plaintiff was not engaging in substantial gainful activity.  Tr. 13.

Plaintiff contends that the earnings the ALJ analyzed at step one represent long-term disability payments to make up the difference in what Plaintiff earned through her part-time work and what she would have made had she been able to work full time.  Pl.'s Reply at 1-2.  Plaintiff notes that she pointed this out to the ALJ before the hearing in her memorandum to the ALJ, *see* Tr. 251, and at the hearing when she testified that she was only working part time.  Pl.'s Reply at 1.  Plaintiff contends that the ALJ "made no inquiry on this issue, in fact posed no questions to [Plaintiff] whatsoever, and elicited no testimony or evidence to contradict what was presented on behalf of [Plaintiff]."  Pl.'s Reply at 1.  Plaintiff further contends that "[t]he ALJ should have given [Plaintiff] t[he] opportunity to[ ]address this issue, and the failure to do so should be error justifying remand for a new hearing."  Pl.'s Reply at 2.

Plaintiff, however, misstates the earnings-related information that she presented to the ALJ.  Contrary to her assertions, Plaintiff never "pointed out to the judge" that Plaintiff's wage information sheet, which states that Plaintiff received $4,271 in "wages paid" in the first quarter of 2020, represented long-term disability payments to make up the difference in what Plaintiff earned through her part-time work and what she would have made had she been able to work full time.  *See* Pl.'s Reply at 1-2; *see also* Tr. 177.  In her memorandum to the ALJ prior to the hearing, Plaintiff simply stated, "In February of 2020 [Plaintiff] returned to the work hardening program at Mayo Clinic, working under

restricted duty status on a part-time basis. [Plaintiff] has been receiving long term disability benefits through her employment since January of 2019." Tr. 251. Plaintiff further stated, "[She] has not worked at or above level substantial gainful activity since January 5, 2019. Since that date [she] has been on long term disability benefits through the Mayo Clinic." Tr. 251. Plaintiff provided no additional information explaining that the $4,271 in wages paid made up the "difference" in what Plaintiff should have been earning as a full-time employee. Similarly, Plaintiff's testimony at the hearing that she was working part-time did not suggest to the ALJ that her wages paid constituted the "difference" in what she should have been earning. *See* Tr. 37.

Rather, substantial evidence supports the ALJ's conclusion that Plaintiff engaged in substantial gainful activity when she returned to work in February 2020. The ALJ analyzed Plaintiff's wage information sheet, which states that Plaintiff received $4,271 in "wages paid" from her employer Mayo Foundation Medical Education Research in the first quarter of 2020. Tr. 13; *see also* Tr. 177. The ALJ concluded properly that this amount constitutes substantial gainful activity because Plaintiff earned greater than $1,260 per month in the first quarter of 2020, which was the monthly substantial gainful activity amount in 2020. *See* Tr. 13; *see also Substantial Gainful Activity*, Social Security Administration, ssa.gov/oact/cola/sga.html (last accessed Feb. 14, 2023). The ALJ looked correctly to Plaintiff's earnings to conclude that she engaged in substantial gainful activity beginning in February 2020 because Plaintiff failed to provide any additional wage-related information to show that the ALJ should deduct some of the wages. *See* 20 C.F.R. 404.1574(a)(1) (stating that the ALJ looks to the claimant's earnings to determine whether

she has engaged in substantial gainful activity "*unless [the ALJ] ha[s] information from [the claimant]* . . . that shows that [the ALJ] should not count all of [Plaintiff's] earnings") (emphasis added).

Further, while Plaintiff contends that the ALJ should have given her the opportunity to address this issue at the hearing, Plaintiff's counsel had sufficient opportunity to do so. Plaintiff's attorney questioned her at the hearing and after numerous questions, Plaintiff's attorney stated that he had "no further questions" for Plaintiff. Tr. 44. As the ALJ noted, Plaintiff "submitted no evidence to support any work subsidies and/or no special circumstances or arrangements with the employer allowing her to earn at this level." *See* Tr. 13. Plaintiff had the burden of proof at step one to prove she was disabled. *See Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). Plaintiff failed to do so here. Accordingly, the ALJ's determination that Plaintiff engaged in substantial gainful activity beginning in February 2020 is supported by substantial evidence in the record.

[Continued on next page.]

## VIII. ORDER

Based upon the record, memoranda, and proceedings herein, and for the reasons

stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment, ECF No. 15, is **DENIED**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 18, is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: February __24__, 2023                          _____*s/Tony N. Leung*_____
                                                                            Tony N. Leung
                                                                            United States Magistrate Judge
                                                                            District of Minnesota

                                                                            *Julie M. C. v. Kijakazi*
                                                                            Case No. 21-cv-2741 (TNL)